IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>CR-TROY, INC.,<br><br>GCSC ENTERPRISES, INC.,<br><br>MACHINE TOOL SERVICE, INC.,<br><br>and VALVOLINE LLC,<br><br>  Defendants. | Case No. 2:23-cv-463 |

## COMPLAINT

The United States of America ("the United States"), by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the United States Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

## NATURE OF ACTION

1. This is a civil action brought under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606, 9607(a), against CR-Troy, Inc. ("CR-Troy"), GCSC Enterprises, Inc. ("GCSC"), Machine Tool Service, Inc. ("MTS"), and Valvoline LLC ("Valvoline") for performance of a remedial action and recovery of the United States' costs incurred or to be incurred in response to releases or threatened releases of hazardous substances at or in connection with the Elm Street Groundwater Contamination Superfund Site (the "Site") located in Terre Haute, Indiana.

2. The United States seeks to recover certain unreimbursed costs incurred and to be incurred for response activities related to the release and threatened release of hazardous substances at the Site. The United States also seeks injunctive relief requiring that Defendants perform the selected remedy for the Site. Finally, the United States seek a judgment on liability for response costs at the Site that will be binding on any subsequent action or actions to recover further Site response costs under CERCLA, 42 U.S.C. § 9613(g)(2).

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action, and the Defendants, under 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. §§ 9607 and 9613.

4. Venue is proper in this District under CERCLA, 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the claims arose, and the threatened and actual releases of hazardous substances occurred, within this judicial district.

## PARTIES

5. Plaintiff, the United States of America, is acting at the request of EPA, an agency of the United States.

6. Defendant CR-Troy is a corporation organized under the laws of Indiana.

7. Defendant GCSC is a corporation organized under the laws of Indiana.

8. Defendant MTS is a corporation organized under the laws of Indiana.

9. Defendant Valvoline is a corporation organized under the laws of Delaware.

## STATUTORY AUTHORITY

10. Where there is a release or threatened release of hazardous substances, CERCLA Section 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), authorizes the United States to recover all

incurred costs of removal or remedial action (i.e., "response costs") to the extent such costs are not inconsistent with the National Contingency Plan ("NCP").

11.    Under CERCLA Section 107(a), 42 U.S.C. § 9607(a), certain classes of "covered persons," or responsible parties, are strictly liable for the United States' response costs, including interest on those costs. Responsible parties under CERCLA include the current "owner and operator" of a "facility" and any person "who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."

12.    CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), provides, in pertinent part: "In any such action [for recovery of costs] . . . , the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." The amounts recoverable include interest on the United States' response costs. 42 U.S.C. § 9607

13.    CERCLA Section 106(a), 42 U.S.C. § 9606, authorizes EPA to issue a unilateral administrative order or seek a judicial order requiring a responsible party to take actions to address "imminent and substantial endangerment to the public health or welfare or the environment" resulting from a release or threatened release of a hazardous substance.

## GENERAL ALLEGATIONS

### The Elm Street Groundwater Contamination Site

14.    The Site is nine acres of industrial and commercial property in Terre Haute, Vigo County, Indiana.

15.    Since the 1930s, the Site has hosted a variety of enterprises including bulk petroleum storage, used oil storage, drum recycling, machine tool repair, and locomotive

servicing. Defendants CR-Troy, GCSC, MTS, and Valvoline have all at various times owned and/or operated their respective enterprises at the Site.

16. Soils, sediments, and groundwater throughout the Site have been contaminated with chemicals which EPA sorted into five classifications: volatile organic compounds ("VOCs"), polycyclic aromatic hydrocarbons ("PAHs"), metals, polychlorinated biphenyls ("PCBs"), and pesticides/herbicides. Each of these include chemicals which are "hazardous substances" within the meaning of CERCLA. 42 U.S.C. §§ 9601(14) and 9607(a).

17. In the early 1980s, Indiana-American Water Company, which operates the City of Terre Haute municipal water system, began noticing chlorinated VOCs — including tetrachloroethene ("PCE"), trichloroethene ("TCE"), 1,1,1-trichloroethane ("TCA"), and 1,2-dichloroethene ("DCE") — in the deep wells of its well field during required monitoring.

18. In the late 1980s, the Indiana Department of Environmental Management ("IDEM") conducted site investigations of three properties at the Site which were suspected potential sources of groundwater contamination.

19. In 1999, IDEM conducted an expanded site investigation of the same three properties at the Site. Analytical results for soil and groundwater samples collected by IDEM indicate that some of the chemicals detected in the municipal wells were also detected in soil and groundwater at the three facilities investigated at the Site.

20. Between 2003 to 2006, EPA issued a series of Information Requests, General Notice Letters, and Special Notice Letters to Valvoline, GCSC, Consolidated Recycling, and MTS in connection with the suspected source areas.

21. On September 9, 2006, EPA proposed the Elm Street Groundwater Contamination Site for inclusion on the National Priorities List ("NPL"). EPA listed the Site on the "NPL" on March 7, 2007.

22. EPA initiated a Remedial Investigation/Feasibility Study ("RI/FS") of the Site in 2009 which it completed on July 20, 2017.

23. In its Remedial Investigation, EPA identified 20 different VOCs, 7 different PAHs, 16 different metals, 2 different PCBs, and 6 different pesticides or herbicides that were present at the Site at levels above their respective screening levels in soil, soil gas, or groundwater. EPA's screening levels are risk-based concentrations derived from standardized equations combining assumptions about possible exposure to the relevant hazardous substances with EPA toxicity data. Screening levels are used for initial site screening and as initial cleanup goals. Screening levels are considered by EPA to be protective for humans (including sensitive groups) over a lifetime of exposure.

24. On September 26, 2017, EPA issued a final Record of Decision ("ROD") pursuant to 42 U.S.C. § 9617 setting forth the selected remedy for the Site after opportunity for public comment.

25. Defendants and EPA entered into an Administrative Settlement Agreement and Order on Consent for Remedial Design (the "ASAOC"), CERCLA Docket No. V-W-19-C-004, effective February 21, 2019. The AOC provided for the performance of a Remedial Design ("RD") by Settling Defendants at the Site and the payment of Future Response Costs, as that term is defined therein.

26. On August 24, 2023, Defendant MTS filed a voluntary petition for bankruptcy under chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the

Southern District of Indiana. *See In Re Machine Tool Service Inc.*, (Bankr. S.D. In. 2023), Case No. 23-80337. While Section 362(a) of the U.S. Bankruptcy Code, 11 U.S.C. § 362(a), automatically stays the commencement of all actions against a party who files for bankruptcy, this automatic stay does not apply to "the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police or regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power." 11 U.S.C. § 362(b)(4). As an action to enforce the United States' police and regulatory power under CERCLA, entry of a judgment in this action falls within this exception to the automatic stay.

27. The Site is a "facility" within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a) because it is a site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.

28. There have been "releases" and "threatened releases" at the Site of hazardous substances within the meaning of CERCLA §§ 101(22) and 107(a), 42 U.S.C. §§ 9601(22) and 9607(a), including of certain VOCs (such as PCE and TCE), PAHs (such as naphthalene), metals (such as arsenic and mercury), PCBs (such as Aroclor-1254 and Aroclor-1260), pesticides (such as heptachlor), and herbicides (such as Mecoprop-p).

29. The releases and threatened releases at the Site have caused an imminent and substantial endangerment to the public health or welfare or the environment within the meaning of CERCLA Section 106(a), 42 U.S.C. § 9606.

**Site Ownership and Operation History**

30. Each Defendant is either the current "owner" or "operator" of part of the Site, or was the "owner" or "operator" of part of the Site at the time of a disposal of hazardous substances.

31. The Site includes three subdivided properties, which the Indiana Department of Environmental Management ("IDEM") identified as potential source areas: (1) the "Gurman Property;" (2) the "Ashland Property;" and (3) the "MTS Property" These areas (outlined in yellow) and the Site (outlined in red) are shown in the map below:



32. In addition to the Ashland, Gurman, and MTS Properties, the Site includes affected creeks, wetlands, drainage ways, groundwater, and residential, industrial, commercial, and vacant properties and alleyways, including municipal drinking water wells.

The Gurman Property.

33. The Gurman Property has been owned by members of the Gurman family since about 1947. In 1991, Isadore and Anne W. Gurman deeded the Gurman Property to Gurman & Sons, Inc., which was later renamed Gurman Container and Supply Corporation, and later renamed again to GCSC.

34. From about 1930 to 1980, Defendant GCSC operated at the Site, primarily reconditioning and selling steel barrels at the Gurman Property. After 1980, Defendant GCSC's operations shifted to sale of paper and plastic containers and reconditioning of customer-owned drums.

35. The entire Gurman Property is currently owned by Defendant GCSC.

The Ashland Property.

36. The Ashland Property is directly west of the Gurman Property and has been operated as a local petroleum bulk plant and used oil storage and transportation facility.

37. Defendants CR-Troy, MTS, and Valvoline have each owned or operated on the Ashland Property at various times.

38. From at least 1944 to 1979, Texaco, Inc. owned the Ashland Property.

39. The Ashland Property was a local Texaco petroleum bulk plant from the 1930s to the 1980s. Petroleum products were stored in bulk there and distributed to service stations.

40. In 1980, Defendant MTS purchased the Ashland Property from Texaco, Inc.

41. From 1983 to 1987, BiState Products operated the Ashland Property as a satellite storage and collection facility for used oils under a lease from Defendant MTS.

42. In 1987, Defendant CR-Troy purchased the Ashland Property from Defendant MTS and thereafter directly operated the used oil storage facility.

43. During BiState and Defendant CR-Troy's operations, BiState and Defendant CR-Troy collected waste oils from hundreds of different industrial, commercial, and agricultural sources and stored the used oil in above-ground storage tanks before shipping them off for recycling. BiState and Defendant CR-Troy were the first parties to traffic in used oil at the Ashland property.

44. In 1990, Defendant Valvoline purchased the Ashland Property. From 1990 to 1999, First Recovery (a division of Defendant Valvoline), operated the Ashland Property as a used oil storage and transfer facility. Historical operations conducted by First Recovery on the Ashland Property included transport and temporary storage of used oil and new and spent mineral spirits for distribution and reclamation off-site. Defendant Valvoline currently owns the Ashland Property.

45. Since 1999, the Ashland Property, still owned by Defendant Valvoline, has been vacant and unused.

The MTS Property.

46. The MTS Property includes two subdivisions: the western portion, primarily associated with the ongoing operations of Defendant MTS, and the eastern portion (also called the former Sinclair property), which hosted former bulk oil and railway-related operations. These are discussed in EPA's December 2016 Remedial Investigation Report.

47. In 1975, Defendant MTS purchased the majority of the property (5 of 7 tax parcels) on the western portion of the MTS Property. In 1979 and 1981, Defendant MTS received the two remaining parcels by quitclaim deed from the Penn Central Corporation and the Cleveland, Cincinnati, Chicago and St Louis Railway Company.

48. Defendant MTS currently owns the entirety of the western half of the MTS Property and one of the parcels on the eastern portion of the MTS Property. The remaining parcels on the eastern portion are owned by other owners, including the City of Terre Haute.

49. From the late 1960s until 2023, Defendant MTS has used the western portion of the MTS Property for machine tool repair and rebuilding.

50. Until the late 1960s, Sinclair Oil used the eastern portion of the MTS Property (made of six tax parcels) as a bulk petroleum plant, with gasoline, oil, and solvents stored aboveground in tanks prior to distribution. Until 1967, this part of the property also previously had a railway roundhouse used by the Penn Central Transportation Company for locomotive repair and maintenance.

51. From 1965 until 2023, Defendant MTS used the MTS Property to operate a machine tool repair and rebuilding business, through which it repaired and retrofitted machine tools, including machining, grinding, calibration and alignments, hydraulic repair, and sales.

52. The Defendants' ownership and operation at the Site is summarized in the table below:

| Settling Defendant | Property | Ownership Dates | Operation Dates |
| --- | --- | --- | --- |
| CR-Troy | Ashland | 1987–1990 | 1984–1990 |
| GCSC | Gurman | 1991–Present | 1922–2018 |
| MTS | Ashland | 1980–1987 | None |
|  | MTS | 1975–Present | 1965–Present |
| Valvoline | Ashland | 1990–Present | 1990–1999 |

**Liability of Defendants**

Liability of Defendant GCSC.

53. Defendant GCSC is a "person" within the meaning of CERCLA, 42 U.S.C. § 9601(21).

54. Since 1991, Defendant GCSC has been an "owner" of the Gurman Property at the Site within the meaning of CERCLA §§ 101(20) and 107(a)(1), 42 U.S.C. §§ 9601(20) and 9607(a)(1).

55. Thus, Defendant GCSC is the current owner of a facility from which there was a release of hazardous substances, or threatened releases of hazardous substances, which caused the incurrence of response costs, within the meaning of CERCLA Section 107(a)(1), 42 U.S.C. § 9607(a)(1).

56. Defendant GCSC, previously as I. Gurman and Sons, Inc. and as Gurman Container and Supply Corporation, has operated at the Site since at least 1922 as a service for reconditioning and sale of wood, steel, and plastic barrels.

57. Defendant GCSC has owned property at the Site since 1991.

58. During Defendant GCSC's ownership or operation at the Site, Defendant GCSC's regular practice was to accept from customers drums containing various types and small quantities of product or waste material, open the drums, dump their contents (including hazardous substances) onto the ground, and rinse the remaining contents into a local storm sewer before refurbishing the drums.

59. In 1988 and 1989, IDEM conducted Site Inspections at the Gurman, Ashland, and MTS facilities. IDEM collected surface and near-subsurface soil samples during the inspections. A near-surface soil sample near a building on the Gurman Property which had been used in barrel reconditioning operations contained chlorinated VOCs including PCE, TCE, trans-1,2-DCE, 1,1,1-TCA, and 1,1-dichloroethane (1,1-DCA).

60. During EPA's Remedial Investigation at the Site, EPA sampling of the Gurman Property detected elevated levels of TCE in three locations in surface soil and one location in

subsurface soil. Elevated TCE results were localized to the eastern and southeastern areas of the Gurman Property near drum unloading, cleaning and storage areas. Nine other volatile organic compounds were detected in soil gas at six locations exceeding screening levels, all located near the southeastern portion of the Gurman Property near the drum processing area.

61. EPA's sampling also detected elevated levels of one pesticide, heptachlor, and one PCB, aroclor-1254, in surface soil on the Gurman Property, near the drum processing area.

62. Defendant GCSC is a person who at the time of disposal of a hazardous substance owned and/or operated a facility at which such hazardous substances were disposed, within the meaning of CERCLA Section 107(a)(2), 42 U.S.C. § 9607(a)(2).

Liability of Defendant CR-Troy.

63. Defendant CR-Troy is a "person" within the meaning of CERCLA, 42 U.S.C. § 9601(21).

64. From 1987 to 1990, CR-Troy owned the Ashland Property during which times disposals of hazardous substances as defined in CERCLA §§ 101(22) and 107(a), 42 U.S.C. §§ 9601(22) and 9607(a), occurred.

65. From 1983 to 1987, BiState Products, a division of Defendant CR-Troy, operated the Ashland Property as a used oil storage under a lease from Defendant MTS. In 1987, CR-Troy directly operated the Ashland Property as a used oil storage facility.

66. During BiState Products and Defendant CR-Troy's operations, BiState and Defendant CR-Troy collected waste oils from hundreds of different industrial, commercial, and agricultural sources and stored the used oil in above-ground storage tanks before shipping them off for recycling.

67. On occasion, employees or customers of BiState and Defendant CR-Troy, especially in the 1980s, would add hazardous substances to used oil for disposal. Adding hazardous substances into used oil was a known industry practice at the time of BiState and Defendant CR-Troy's used oil storage operations. According to the testimony of one employee of BiState and Defendant CR-Troy, "nobody cared" about mixing hazardous substances in with used oil handled by BiState and Defendant CR-Troy until the 1990s, which is when EPA issued management standards for used oil.

68. BiState and CR-Troy handled used oil at the storage tanks and a nearby warehouse, which were connected by underground pipes. At times, employees at BiState and/or CR-Troy would spill small amounts of used oils during transfer of the used oils to storage.

69. A 1989 IDEM Screening Site Inspection Report documented soil staining and oily gravel near transfer terminal connections and around the central storage area which appeared to be the result of used oil spillage. An EPA inspection report attached to the Screening Site Inspection Report documented that surface and near surface soils were contaminated with oils. The EPA inspection report stated that poor product or waste handling practices could have released TCE or PCE to the ground surface or shallow groundwater.

70. A 2002 IDEM Expanded Site Inspection documented that a soil boring taken near the used oil transfer and pumping area detected PCE at a depth suggesting that the PCE migrated from a release at or near the soil surface.

71. The Expanded Site Inspection concluded that the most likely potential source areas on the Ashland Property included the storage tank farm used in BiState and CR-Troy's operations and areas in which two underground storage tanks were excavated and removed in 1986 and 1988, during BiState and CR-Troy's ownership and operation of the Ashland Property.

72. The 1989 Screening Site Inspection documented the presence of TCE in the area that one such underground storage tank was excavated and removed during BiState and/or CR-Troy's ownership and operation of the Ashland Property.

73. EPA's RI also found levels of VOCs and semi-volatile organic compounds ("SVOCs") to be most highly concentrated under the warehouse building on the Ashland Property.

74. Defendant CR-Troy is a person who at the time of disposal of a hazardous substance was an "operator" of a facility at which such hazardous substances were disposed, within the meaning of CERCLA Section 107(a)(2), 42 U.S.C. § 9607(a)(2).

Liability of Defendant Valvoline.

75. Defendant Valvoline is a "person" within the meaning of CERCLA, 42 U.S.C. § 9601(21).

76. Defendant Valvoline is the "owner" of the Ashland Property within the meaning of CERCLA §§ 101(20) and 107(a)(1), 42 U.S.C. §§ 9601(20) and 9607(a)(1), which constitutes part of the Site.

77. Defendant Valvoline is the current owner of a facility from which there was a release of hazardous substances, or threatened releases of hazardous substances, which caused the incurrence of response costs, within the meaning of CERCLA Section 107(a)(1), 42 U.S.C. § 9607(a)(1).

Liability of Defendant MTS.

78. Defendant MTS is a "person" within the meaning of CERCLA, 42 U.S.C. § 9601(21).

79. Since 1981, Defendant MTS has owned all tax parcels on the western half of the MTS Property and one tax parcel (out of six) on the eastern half.

80. Defendant MTS is the "owner" of parts of the MTS Property within the meaning of CERCLA §§ 101(20) and 107(a)(1), 42 U.S.C. §§ 9601(20) and 9607(a)(1), which constitutes part of the Site.

81. Defendant MTS is the current owner of a facility from which there was a release of hazardous substances, or threatened releases of hazardous substances, which caused the incurrence of response costs, within the meaning of CERCLA Section 107(a)(1), 42 U.S.C. § 9607(a)(1).

82. Defendant MTS also owned the Ashland Property from 1980 to 1987.

83. As alleged above, the operations of BiState Products and Defendant CR-Troy caused the disposals of hazardous substances at the Ashland Property during the time that Defendant MTS owned the Ashland Property

84. Defendant MTS is a person who at the time of disposal of a hazardous substance owned a facility at which such hazardous substances were disposed, within the meaning of CERCLA Section 107(a)(2), 42 U.S.C. § 9607(a)(2).

**Incurrence of Response Costs**

85. Releases and threatened releases of hazardous substances from the Site, including at the Gurman Property, MTS Property, and Ashland Property, have caused the incurrence of "response" costs within the meaning of CERCLA §§ 101(25) and 107(a), 42 U.S.C. §§ 9601(25) and 9607(a).

86. As of March 28, 2022, EPA has incurred at least $5,222,823.09 in unreimbursed response costs associated with the Site, including at the Gurman Property, MTS Property, and Ashland Property.

87. The above-referenced response costs incurred by the United States qualify as costs of "response" and "costs of removal or remedial action incurred by the United States Government" under CERCLA Sections 101(25) and 107(a)(4)(A), 42 U.S.C. §§ 9601(25) and 9607(a)(4)(A).

88. The response costs and cost of removal that the United States incurred for the Site, including at the Gurman Property, MTS Property, and Ashland Property, were "not inconsistent with the national contingency plan" within the meaning of CERCLA §§ 101(31) and 107(a)(4)(A), 42 U.S.C. §§ 9601(31) and 9607(a)(4)(A).

89. The United States may continue to incur response costs associated with the Site, including at the Gurman Property, MTS Property, and Ashland Property.

90. The amounts recoverable in an action under CERCLA Section 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), include statutory prejudgment interest on the response costs. Such interest accrues from the later of: (i) the date that payment of a specified amount is demanded in writing or (ii) the date of the expenditure concerned.

91. The United States made a written demand for payment of a specified amount of unreimbursed response costs in a November 17, 2022 correspondence addressed to representatives of each of the Defendants.

## CLAIMS FOR RELIEF

### First Claim for Relief
(Cost Recovery by the United States Under CERCLA Section 107, 42 U.S.C. § 9607)

92. Paragraphs 1–91 are realleged and incorporated herein by reference.

93. Under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendants are each liable to the United States for all costs incurred and to be incurred by the United States related to the Site, as well as enforcement costs and prejudgment interest on such costs.

## Second Claim for Relief
### (Declaratory Judgment for Recovery of Further Response Costs by the United States)

94. Paragraphs 1–91 are realleged and incorporated herein by reference.

95. Under Sections 107(a) and 113(g) of CERCLA and the Declaratory Judgment Act, 42 U.S.C. §§ 9607(a) and 9613(g)(2), , 28 U.S.C. §§ 2201-2202, each Defendant is liable to the United States for any unreimbursed response costs that the United States has incurred or incurs in the future in connection with releases of hazardous substances at the Site, not inconsistent with the NCP..

## Third Claim for Relief
### (Injunctive Relief Under CERCLA Section 106, 42 U.S.C. § 9606)

96. Paragraphs 1–91 are realleged and incorporated herein by reference.

97. EPA has determined that there is or may be an imminent and substantial endangerment to the public health or welfare or the environment because of actual and threatened releases of hazardous substances, including VOCs, arsenic, PAHs, pesticides, and PCBs, into the environment at and from the Site.

98. Under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), Defendants are subject to injunctive relief to abate the danger or threat presented by releases or threatened releases of hazardous substances into the environment at and from the Site.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, respectfully requests that this Court:

1. Enter judgment in favor of the United States and against the above-named Defendants for response costs incurred by the United States, including prejudgment interest, in connection with the above-described response actions relating to the Site;

2. Enter a declaratory judgment of liability against Defendants under CERCLA, 42 U.S.C. § 9613(g)(2), that will be binding on any subsequent action or actions to recover further response costs for the Site;

3. Order the above-named Defendants to abate the conditions at the Site that may present an imminent and substantial endangerment to the public health or welfare or the environment;

4. Award the United States its costs of this action; and

5. Grant such other and further relief as the Court deems just and proper.

**FOR THE UNITED STATES OF AMERICA**

Dated: September 26, 2023

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, D.C. 20530

_____
PEDRO SEGURA
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611

ZACHARY A. MYERS
United States Attorney
Southern District of Indiana

J. Taylor Kirklin
Assistant United States Attorney
United States Attorney's Office
10 W Market St, Suite 2100
Indianapolis, IN 46204
taylor.kirklin@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on this date I caused copies of the foregoing Notice of Lodging (and the accompanying proposed Consent Decree) to be served on the following individuals by electronic mail:

For CR-TROY, INC.:

Joel T. Bowers
Attorney for CR-Troy, Inc.
Barnes & Thornburg LLP
201 S. Main Street, Ste. 400
South Bend, IN 46601
574-237-1287
Joe.Bowers@btlaw.com

For GCSC ENTERPRISES, INC.:

G. Michael Schopmeyer, Esq. and Monica E. Edwards, Esq.
Attorneys for GCSC Enterprises, Inc.
Kahn, Dees, Donovan & Kahn, LLP
P.O. Box 3646
Evansville, Indiana 47735-3646
812-423-3183
mschopmeyer@kddk.com;
medwards@kddk.com

For MACHINE TOOL SERVICE, INC.:

Marc Menkveld
Attorney for Machine Tool Service, Inc.
Menkveld Law & Mediation
16556 W. 94th Dr.
Arvada, CO 80007
(720) 280-3811
marc@menkveldlaw.com

For VALVOLINE LLC:

Kathleen Campbell, Esq.
Partner
Manko, Gold, Katcher & Fox, LLP
3 Bala Plaza East, Suite 700
Bala Cynwyd, PA 19004
484-430-2316
kcampbell@mankogold.com

Dated: 9/26/2023

_____
Pedro Segura
Trial Attorney
United States Department of Justice
Environmental Enforcement Section
Environment & Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
(202) 532-3153
Pedro.Segura@usdoj.gov